UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

EMELL OWENS,

                 Plaintiff,         **MEMORANDUM & ORDER**
                                    20-CV-118(EK)(RLM)

       -against-

CENTENE CORPORATION and CENTENE
MANAGEMENT COMPANY, LLC,

                 Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

        In this diversity action, Emell Owens brings suit
under the New York City Human Rights Law, N.Y.C. Admin. Code
§§ 8-101 to 8-134 ("NYCHRL"), against her former employers,
Centene Corporation and Centene Management Company, LLC
(collectively "Centene").  Owens alleges that Centene terminated
her employment "on the basis of perceived marital status and /
or perceived relationship status" after learning that she and
one of her subordinates shared a child born many years prior,
before either came to work for the company.  Am. Compl. ¶ 1, ECF
No. 12; *see also id.* ¶ 40 ("After Ms. Owens admitted . . . that
she had a son with Mr. Johnson," the HR Director "summarily
terminated her employment and directed that she be escorted from
the building.").  She also claims that her coworkers subjected

her to a hostile work environment, "aided and abetted" by Centene.  *Id.* at ¶ 1.

Centene responds that it terminated Owens because she intentionally misled the company during two internal investigations into allegations that she displayed favoritism towards Johnson, a subordinate employee in her direct reporting line.  Centene now moves for summary judgment, contending that Owens has adduced insufficient evidence that this reason was pretextual.  For the reasons stated below, the motion for summary judgment is GRANTED.

## I.  Background[1]

From 2017 to 2019, Emell Owens worked as Director of Provider Relations at Fidelis Care, a New York health insurance company, and Centene, which acquired Fidelis in July 2018. Pl.'s 56.1 Statement ¶¶ 4-6, ECF No. 58.  She oversaw a team of relationship managers who served healthcare providers across downstate New York.  Defs.' 56.1 Statement ¶ 22, ECF No. 53; Pl.'s 56.1 ¶ 22.  Owens had several direct reports, including two supervisors who each, in turn, had a team of individuals reporting to them.  Pl.'s 56.1 ¶ 24.  One of those supervisors

---

[1] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Defs.' 56.1" (ECF No. 53)), and Plaintiff's opposition thereto ("Pl.'s 56.1" (ECF No. 58)).  I view the facts in the light most favorable to Plaintiff as the nonmovant.  Citations to a party's Rule 56.1 Statement should be read to incorporate the documents cited therein.

was Janette Perez, who had a direct report named James Johnson. Johnson started working at Centene in December 2018. *Id.* ¶¶ 24, 37-38; Defs.' 56.1 ¶¶ 24, 37-38. He is the father of Owens' son, who was born in 2000. Tr. of Emell Owens Deposition 89:6-7, ECF No. 52-3. Owens and Johnson are not married or currently in a relationship, but both are involved in their son's life. Pl.'s 56.1 ¶ 31.

## A.   The Brewster Allegations

In February 2019, Owens emailed her supervisor to complain that an employee named Ava Brewster had sent her text messages "which she felt were threatening in nature." *Id.* ¶ 42; Defs.' 56.1 ¶ 42. Owens' supervisor forwarded her complaint to Centene's Human Resources department, which opened an investigation. Pl.'s 56.1 ¶¶ 46-47; Defs.' 56.1 ¶¶ 46-47. Melanie Horner, a Human Resources Business Partner, took the lead; at the culmination of her investigation, Horner sent a comprehensive report to Brian Kuzmiak, a Senior Manager in Centene's H.R. department, and Diana Chiappetta, the Vice President in charge of H.R. *See* Horner Investigation Report dated Mar. 6, 2019, at 2, Ex. N to Mellk Decl., ECF No. 52-14.[2]

During the investigation, Horner spoke with Brewster multiple times, beginning on February 28. *Id.* at 2. Brewster

---

[2] Page numbers in citations to record documents other than deposition transcripts and briefs refer to ECF pagination.

alleged that Owens' animus towards her arose out of Brewster's previous refusal to hire Johnson.  Brewster claimed that after she opted not to hire Johnson, Owens "entire demeanor towards me changed," and that Owens "made several comments" to Brewster "insinuat[ing] that she would try to get me fired."  Email from Brewster to Horner dated Mar. 1, 2019, at 2-3, Ex. Q to Mellk Decl., ECF No. 52-17.  Brewster followed up with another email to Horner on March 4, reiterating these allegations.  Email from Brewster to Horner dated Mar. 4, 2019, at 2-3, Ex. S to Mellk Decl., ECF No. 52-19.  In the March 4 email, Brewster went on to claim that Owens "hired James Johnson to work on her team" and that Brewster "believed" that Johnson "was Ms. Owen's [sic] child's father."  Horner Investigation Report 3.

Horner "followed up" with Ms. Owens that same day (March 4), after Horner had conducted "another discussion with Ms. Brewster."  Horner Investigation Report 4-5.  In her contemporaneous investigation memorandum, Horner recorded that Owens "denied that allegation that James Johnson was related to her children."  *Id.* at 5.

Owens disputes that she said that.  She denied, in her deposition, that Horner ever asked her (a) whether she shared a child with Johnson or (b) whether she and Johnson had a *previous* relationship.  Owens testified that months later, when she spoke

4

to Brian Kuzmiak on the same day as her September 20, 2019

termination, Kuzmiak asked her:

> Do you share a child with James Johnson?  And I said
> yes.  And he asked why didn't I mention that in a
> previous meeting . . . with Melanie Horner.  And I
> said because I was not asked.  And he said, but you
> were asked if you were in a relationship with James
> Johnson.  I said I was asked if I was in a *current*
> relationship with James Johnson, and that's what I
> answered.

Owens Dep. 171:17-172:3 (emphasis added).[3]

Horner did not, at this point, substantiate Brewster's

allegations.  The March 2019 investigation concluded with a

"determination that Ms. Brewster's allegations of retaliatory /

harassing behavior by Plaintiff were unfounded."  Horner

Investigation Report 6.  Horner recommended that Owens and

Brewster "be coached about professional communication and

relationships in the workplace."  *Id.*; Pl.'s 56.1 ¶ 69.

**B.   The Anonymous Ethics Hotline Tip**

In August 2019, Centene's H.R. department received an

anonymous complaint on its "Ethics Point Hotline."  *See* Malone

Investigation Report dated Sept. 4, 2019, at 2, Ex. U to Mellk

Decl., ECF No. 52-21.  The caller alleged that Owens hired

Johnson, that the two shared a child, and that Johnson "is given

special treatment including an exceptionally light workload."

---

[3] *See also* Owens Dep. 142:6-15 (Owens is asked, "Was that accurate?  Is that what you told Ms. Horner?" and replies: "No.  I was not asked if I gave preferential treatment towards team members, and I was not asked about my children during any of those conversations.").

Ethics Point Hotline Log 3, Ex. T to Mellk Decl., ECF No. 52-20;
Pl.'s 56.1 ¶ 76; Defs.' 56.1 ¶ 76.  Supervisor Kuzmiak assigned
another H.R. employee — this time Mary Malone — to investigate.
Malone met with Owens and told her, among other things, that she
was investigating an allegation of favoritism.  Pl.'s Mem. in
Opp. 4, ECF No. 55; Malone Investigation Report 3.

Malone's investigation report, like Horner's before
her, documents that Owens was asked about her outside
relationship with Johnson — past and present.  Specifically, the
memorandum reports that Owens stated during the interview that
"she is not *nor has she ever been* in a relationship with James
Johnson" and that their relationship was "purely professional."
Malone Investigation Report 3 (emphasis added).  Malone's report
also reflects that Owens affirmatively raised the investigation
that Horner had conducted months prior.  In memorializing this
exchange, Malone once again recorded Ms. Owens denying a present
*or past* relationship with Johnson:

> Ms. Owens stated that this was not the first time she
> had been accused of violating [Centene's Code of
> Conduct].  Ms. Owens stated [that] in March 2019, she
> was investigated by Human Resources.  A Supervisor,
> Ava Brewster, claimed that Ms. Owens *had been involved*
> with Mr. Johnson *prior to hire*.  That investigation
> yielded no evidence to support the allegation.

*Id*. (emphasis added).  In her deposition in this case, Owens
denied that Malone, too, had asked her about a prior

relationship with Johnson or whether they shared a child.  *See* Owens Dep. 166:2-15; 171:16-172:3.

Malone also interviewed James Johnson (one day after interviewing Owens).  Malone's report reflects that he flatly denied that he and Ms. Owens shared a past.  Malone Investigation Report 3.  The report states that he claimed to have been "referred [to the company] by a family friend, Yazmin Brown," and that he "did not know Emell Owens prior to his hire."  *Id*.  Ms. Malone's bullet points indicate that Johnson left little doubt about where he stood on the matter: "Mr. Johnson stated he did not father a child with Ms. Owens.  He specifically indicated that he does not have any children."  *Id*.

Malone's report concluded that there was "no evidence to support the claim that Ms. Owens was involved in a personal relationship with James Johnson" and there was no evidence that Johnson received preferential treatment.  *Id.* at 4.

## C.  Anonymous Email to Human Resources

Centene received an anonymous third complaint on September 19, 2019, this one via email to Kuzmiak.  Defs.' 56.1 ¶¶ 92-94; Pl.'s 56.1 ¶¶ 92-94; *see* Email Complaint dated Sept. 19, 2019, Ex. V. to Mellk Decl, ECF No. 52-22.[4]  This email attached photographs from Owens' and Johnson's Facebook

---

[4] T. Ziegler-Moore, another Centene employee who reported to Owens, later admitted that she sent the email in question.  Tr. of T. Ziegler-Moore Deposition 24:4-23, ECF No. 52-5; *see also* Pl.'s 56.1 ¶ 92.

accounts; these photos, according to the email, showed that the
two shared a son.  Email Complaint dated Sept. 19, 2019, at 1,
3-7.  After receiving this email, Kuzmiak investigated it
himself.  Defs.' 56.1 ¶¶ 96-101; Pl.'s 56.1 ¶¶ 96-101.  Kuzmiak
wrote a report to Ms. Chiappetta, the Vice President, dated
September 20, 2019, to memorialize his findings.  Kuzmiak
Investigation Report dated Sept. 20, 2019, Ex. X to Mellk Decl.,
ECF No. 52-24.

The report reflects that on September 20, 2019,
Kuzmiak and Dewayne McQueen, another H.R. professional, met with
Owens to discuss the new complaint and photographs.  Kuzmiak
Investigation Report 2; *see also* Pl.'s 56.1 ¶ 100; Defs.' 56.1 ¶
100.  At that meeting, Owens acknowledged that Johnson was the
father of her child.  Pl.'s 56.1 ¶ 102.  Kuzmiak's report
indicates that, in contrast to her deposition testimony, Owens
admitted having misled the previous investigators: "Owens
admitted that on two separate occasions, when questioned by
Human Resources, Ms. Owens did not tell the truth regarding her
relationship with Mr. Johnson."  Kuzmiak Investigation Report 3.
At his deposition, Kuzmiak testified that he asked Owens at the
September 2019 meeting, "[w]hy didn't she tell the truth
previously when questioned."  Tr. of Brian Kuzmiak Deposition
57:4-9, ECF No. 52-4.  Owens replied, according to Kuzmiak, not
that she hadn't been asked, but that "she didn't [admit the

relationship] because she felt like it was none of our business." *Id.*

As noted above, Owens recalled the interaction with Kuzmiak differently at her deposition: she testified that Kuzmiak asked her whether she shared a child with Johnson and that she replied "yes," Owens Dep. 171:16-18, and then went on to indicate that the previous interviewers had failed to ask about the child or the previous relationship. *Id.* at 171:21-22.

D. **Owens' Termination and Complaint**

Later that day, after consulting with Vice President Chiapetta and Centene's in-house counsel, Kuzmiak terminated both Owens' and Johnson's employment. Kuzmiak Dep. 81:6-20; *see also* Defs.' 56.1 ¶ 106; Pl.'s 56.1 ¶ 106. The termination review form noted that Owens was fired because she "intentionally: i) misrepresented her relationship with a subordinate; and ii) failed to provide a truthful account of her actions to Human Resources." Termination Review Form 2, Ex. Y to Mellk Decl., ECF No. 52-25.

Owens brought suit in January 2020, asserting claims for discrimination and hostile work environment under New York City's Human Rights Law on the basis of her "perceived marital

and / or partnership status."  Am. Compl. ¶ 1.[5]  She alleges no federal cause of action.  The court has jurisdiction under 28 U.S.C. § 1332(a).[6]

## II.  Legal Standards

Summary judgment is appropriate if the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56.  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[7]

The moving party has the burden of demonstrating the absence of a question of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its burden, "the nonmoving party must come forward with

---

[5] "The NYCHRL has no administrative exhaustion requirement."  *Shaw v. Long Island R.R. Co.*, No. 16-CV-6972, 2018 WL 748674, at *2 (E.D.N.Y. Feb. 7, 2018); *see also Cherry v. New York City Hous. Auth.*, 564 F. Supp. 3d 140, 164 n.12 (E.D.N.Y. 2021) (holding that "there is no exhaustion requirement under the NYSHRL and the NYCHRL").

[6] Plaintiff is a citizen of New York; Centene Corporation is incorporated in Delaware and its principal place of business is in Missouri. Centene Management is also based in Missouri and is wholly owned by Centene. The amount in controversy exceeds $75,000.  *See* Am. Compl. ¶ 2.

[7] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the non-moving party fails to do so, the claim must be dismissed.  The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

### A.   NYCHRL Discrimination Claim

The NYCHRL, N.Y.C. Admin. Code §§ 8-101 to 8-134, is the City's analog to Title VII (though as discussed below, it applies more broadly).  It provides, in relevant part, that an employer is prohibited from discriminating against any person "because of [his or her] actual or perceived . . . marital status." *Id.* § 8-107(1)(a).[8]

---

[8] The parties vigorously disagree about whether the NYCHRL applies to Owens' situation of having once been in a relationship and sharing a child with another employee.  *See* Pl.'s Mem. in Opp. 6-8; Defs.' Mem. in Supp. 12-14, ECF No. 49.  In *Morse v. Fidessa Corp.*, the Appellate Division held that the NYCHRL's prohibition against discrimination based on marital status "must be given a broader meaning than simply married or not married, and that it must encompass other factors that may be used to deem the relationship disqualifying, *i.e.*, unacceptable." 84 N.Y.S.3d 50, 51 (App. Div. 1st Dept. 2018).  That case concerned a company that terminated the plaintiff's employment because it believed that the plaintiff was married to someone who left its employ to work for a competitor.  *Id.*  In affirming the denial of the defendant's motion to dismiss, the *Morse* court observed that "encompassing couples' protection within the proscription against discrimination on the basis of marital status is the best way to achieve

The law is interpreted broadly.  "[F]or many years, the NYCHRL was construed to be coextensive with its federal and state counterparts." *Velazco v. Columbus Citizens Found.,* 778 F.3d 409, 410 (2d Cir. 2015).  Following 2005 amendments, however, judicial "interpretations of state and federal civil rights statutes [now] serve only as a floor below which the [NYCHRL] cannot fall." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir. 2013).  The NYCHRL is to "be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." *Id.*  Still, this liberal construction does not relieve the plaintiff of her basic burden; "a defendant is not liable [under the HRL] if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Id.* at 113.

The Second Circuit has directed trial courts to approach NYCHRL discrimination claims as follows: "the plaintiff must establish a *prima facie* case, and the defendant then has the opportunity to offer legitimate reasons for its actions." *Ya-Chen Chen v. City University of New York*, 805 F.3d 59, 75-76 (2d Cir. 2015).  "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could

broad coverage of the City Law." *Id*. at 58.  *Morse* does not squarely reach the instant facts, as it did not implicate anti-nepotism principles or involve similar allegations of favoritism or conflict of interest.  Still, I assume (without deciding) that a termination genuinely motivated (at least in part) by the relationship status at issue here can be actionable.

conclude either that the defendant's reasons were pretextual or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.*; *see also Suri v. Grey Global Group, Inc.*, 83 N.Y.S.3d 9, 24-25 (App. Div. 1st Dept. 2018) ("If the employer succeeds in [showing a legitimate, nondiscriminatory reason for the employment decision], the burden then shifts back to the plaintiff to prove that the reason proffered by the employer was merely a pretext for discrimination."). Summary judgment "is appropriate if the record establishes as a matter of law that discrimination" played "no role in the defendant's actions." *Ya-Chen Chen*, 805 F.3d at 75-76. The *Ya-Chen Chen* court noted that "in the discrimination context, this inquiry closely mirrors" the federal burden-shifting framework of *McDonnell Douglas* at summary judgment. *Id.* at 76 n.13.[9]

In assessing the evidence for both parties' positions, I proceed through the three stages set out in the *McDonnell Douglas* framework.

_____

[9] The Second Circuit had left open, at least at one point, the question of "whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified" for discrimination claims under the NYCHRL. *Mihalik*, 715 F.3d at 110 n.8. More recently, however, the Circuit stated that discrimination claims under the NYCHRL "are governed by the burden-shifting framework set forth in *McDonnell Douglas*." *Bourara v. N. Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc., Emp. Benefit Funds*, No. 20-3092, 2021 WL 4851384, at *1 (2d Cir. Oct. 19, 2021). Regardless, the burden-shifting framework provides a logically coherent way to assess the parties' evidence here, so I organize the analysis in the three familiar stages — even if the structure functions here purely as an analytical tool.

1.   Owens' *Prima Facie* Case of Discriminatory Motive

At the first stage of the *McDonnell Douglas* framework, we assess whether the plaintiff has established a *prima facie* case of discrimination (subject to the applicable level of causation).  In this NYCHRL claim, that means we assess whether Owens has established a *prima facie* case, which consists of "showing that she is a member of a protected class, she was qualified to hold the position, and that she suffered adverse employment action under circumstances giving rise to an inference of discrimination."  *Hudson v. Merrill Lynch & Co.*, 31 N.Y.S.3d 3, 7 (App. Div. 1st Dept. 2016); *see also Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30-31 (App. Div. 1st Dept. 2012) (noting same standard).  I conclude that Owens has made out a *prima facie* case here, although she just barely satisfies the last element of this test — that the circumstances of her termination give rise to an inference of discrimination.

Owens contends that Centene terminated her employment on the basis of "an actual or perceived marital or partnership relationship"; specifically, because "of the company's discovery that she had a child with a coworker, James Johnson."  Pl.'s Mem. In Opp. 1.  Evidence of discriminatory motive or animus can come in many forms.  These include "comments indicating prejudice on account of a protected characteristic" or evidence that "comparators were treated better than [the plaintiff] was."

14

*Ibrahim v. Fid. Brokerage Servs. LLC*, No. 19-CV-3821, 2020 WL
107104, at *5 (S.D.N.Y. Jan. 9, 2020).  Owens points to no
evidence in these categories.  On the contrary, she testified
that no one at Centene expressed any animus towards her with
respect to her marital status, *see* Owens Dep. 163:20-164:4, or,
for that matter, even *asked* about her marital status outside of
the investigative interviews conducted by Horner, Malone, and
Kuzmiak.  *Id*. at 197:8-18.

> Instead, all Owens can point to is the temporal
proximity between the time she acknowledged her prior
relationship with Johnson, on the one hand, and her termination,
on the other.  Pl.'s 56.1 ¶¶ 102-03 (Kuzmiak terminated Owens
shortly after she admitted having a child with Johnson, on the
same day).  Temporal proximity usually comes up in the Title VII
retaliation context; there, it is clear that temporal proximity
can suffice to establish a *prima facie* case (but not ultimate
liability) if the proximity is "very close."  *Clark County Sch.
Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  Here, Centene
terminated Owens the day she acknowledged the truth of her
relationship with Johnson.  Given that Title VII serves as a
floor for NYCHRL purposes, I proceed to the next step of the
analysis.

2.  Centene's Proffered Legitimate, Nondiscriminatory
    <u>Basis</u>

Despite the conclusion that Owens has failed to
establish a *prima facie* case, I proceed to the second *McDonnell
Douglas* stage.  Centene says that Owens was terminated for
dishonesty in the course of a company investigation, rather than
for her relationship status itself.  Defs.' 56.1 ¶¶ 106-07;
Termination Review Form 2 (documenting that Centene terminated
Owens because she "intentionally . . . misrepresented her
relationship with a subordinate" and "failed to provide a
truthful account of her actions to Human Resources.").  As
discussed above in detail, Centene points to substantial
evidence in support of this justification, in the form of
contemporaneous records created independently by two different
Human Resources professionals, neither of whom made the decision
to fire Owens.

As set forth above, Horner and Malone both recorded,
in investigation memoranda written months apart, that Owens had
explicitly denied having a child in common with Johnson or
having retaliated against a subordinate (Brewster) who had
declined to hire Johnson.  Horner Investigation Report 5 ("Ms.
Owens . . . denied that allegation that James Johnson was
related to her children."); Malone Investigation Report 3 ("Ms.
Owens stated that she is not nor has she ever been in a

16

relationship with James Johnson.  Their relationship is purely professional.").

These contemporaneous memoranda by Human Resources personnel constitute powerful evidence that Owens did lie to Centene's Human Resources personnel.  *See, e.g.*, *Johnson v. IAC/InterActiveCorp*, 118 N.Y.S.3d 561, 564 (App. Div. 1st Dept. 2020) (affirming grant of summary judgment on NYCHRL retaliation claim where plaintiff cited "no evidence that such *extensive, detailed, contemporaneous* records [of plaintiff's poor performance] were fabricated") (emphasis added); *see also Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir. 2011) (affirming grant of summary judgment where plaintiff's opposition "relied almost entirely on her own testimony" but defendant "submitted competent and persuasive evidence [to the contrary], including contemporaneous letters and meeting notes"); *Cruz v. Reiner*, No. 11-CV-2131, 2013 WL 5676303, at *1 (E.D.N.Y. Oct. 16, 2013) (holding that the plaintiff could not raise a genuine issue of fact "based solely on his uncorroborated version of the events," when, among other things, "contemporaneously prepared business records of the police department, including some prepared by officers uninvolved in this case, directly refute[d] his version of the facts").

And it is well settled that lying to one's employer is a valid non-discriminatory basis for termination.  *See, e.g.*,

*Daeisadeghi v. Equinox Great Neck, Inc*., No. 16-CV-1698, 2019 WL 331637, at *8 (E.D.N.Y. Jan. 25, 2019) (defendant articulated legitimate nondiscriminatory reasons for termination, including that plaintiff had "lied when responding to inquiries from his superiors"); *Gonzalez v. United Parcel Service, Inc*., No. 15-CV-8421, 2017 WL 8780567, at *2 (S.D.N.Y. Nov. 8, 2017) (granting summary judgment on NYCHRL claim where defendant "offered a legitimate, nondiscriminatory reason for plaintiff's termination: that he lied to management during an investigation"); *Sass v. MTA Bus Co.*, No. 10-CV-4079, 2012 WL 4511394, at *7 (E.D.N.Y. Oct. 2, 2012) (lying during investigation was a legitimate reason for terminating employee).

### 3. <u>Owens' Evidence of Pretext</u>

As noted above, Owens contends that she did not lie: rather, she simply was not asked about a prior relationship with Johnson or whether they shared a child.  This contention is relevant at stages two and three of the *McDonnell Douglas* framework.  The contention cannot create a genuine dispute of fact, however — even if Owens had established a *prima facie* case — because accepting it would require a "suspension of disbelief" beyond the capacity of any reasonable person.  *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005).

For Owens' denial that she lied to be accepted, the following would have to be true: Horner and Malone would both

have to have failed, independently of one another, to have asked about Owens' history with Johnson or their shared child, even though those issues were placed front-and-center by complaints of favoritism that figured prominently in both investigations. *See, e.g.*, Horner Investigation Report 3 (Brewster complained of Owens' "preferential treatment" of a team member and "stated that Ms. Owens hired James Johnson to work on her team, who she believed was Ms. Owen's [sic] child's father"). Then, despite such omissions, Horner and Malone would both — again, independently of one another — have had to fabricate Owens' direct and false responses to these unasked questions for their investigative memoranda. Bizarrely, Horner and Malone would have created those fabrications (on Owens' theory) in the course of conducting investigations in which they both found no evidence of wrongdoing.

Moreover — and most outlandishly — Ms. Horner would have had to fabricate that evidence for the purpose of supporting a termination that occurred six months later, despite the fact that Horner *did not know*, when she wrote her memo, the true facts that would later motivate the ostensibly discriminatory termination. (Horner's summary of investigation was dated March 6, 2019; Owens was terminated on September 20, 2019.) In the end, Owens' position is internally (and fatally) contradictory: she is claiming that Centene fired her after

learning her parental and relationship status in September 2019,
but also that Centene's Human Resources department was
fabricating evidence against her six months earlier, before
anyone in HR had actually learned the truth about that status,
even on *Owens' own version of the facts*.

Even putting aside these logical inconsistencies,
Owens has suggested no reason why Horner and Malone would be
inclined to conspire against her.  *See O'Connor v. Viacom
Inc./Viacom Int'l Inc.*, No. 93-CV-2399, 1996 WL 194299, at *8
(S.D.N.Y. Apr. 23, 1996) (granting summary judgment to defendant
where plaintiff's "completely unsubstantiated claim of a
conspiracy to effect her termination is not supported by
evidence"), *aff'd*, 104 F.3d 356 (2d Cir. 1996); *see also Allen
v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 445
(S.D.N.Y. 2002) (granting summary judgment to defendant where
plaintiff's "sole support" for Title VII claim was "conclusory
allegations of an elaborate conspiracy to persecute her"),
*aff'd*, 64 F. App'x 836 (2d Cir. 2003).  If they were motivated
by her parental status and perceived relationship status, as
Owens claims, these fabrications were an odd way of showing it:
the reports both conclude that Owens was not showing favoritism
or laboring under a conflict.  *See* Horner Investigation Report 6
("There is no evidence to support Ms. Brewser's [sic]
allegations."); Malone Investigation Report 4 ("There is no

evidence to support the claim that Ms. Owens was involved in a personal relationship with James Johnson.").

Finally, it bears noting that even if Owens had established some reason to *doubt the accuracy* of Centene's conclusion that she lied, that would not necessarily support an inference of discriminatory intent.  "Where a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault to the plaintiff, but whether the employer made a good-faith business determination."  *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer."); *Agugliaro v. Brooks, Inc.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").
Antidiscrimination laws like the NYCHRL are designed to prohibit adverse employment actions based in discrimination, not to police the accuracy of other (non-discriminatory) bases for termination.  *See, e.g.*, *Ya-Chen Chen*, 805 F.3d at 76 ("Even

under the NYCHRL, the mere fact that a plaintiff may disagree and think that her behavior was justified does not raise an inference of pretext.").

Because Owens presents insufficient evidence that Centene's decision to terminate her employment was motivated, in any part, by discrimination based on her perceived marital or partnership status, Centene is entitled to summary judgment on her discrimination claim.

**B.   NYCHRL Hostile Work Environment Claim**

Owens also claims that Centene maintained a hostile work environment.  "Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  Under the NYCHRL, unlike Title VII, Centene's discriminatory conduct need not be "severe or pervasive" to constitute a hostile work environment.  *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39-41 (App. Div. 1st Dept. 2009).  Instead, a plaintiff "claiming a hostile work environment need only demonstrate that he or she was treated less well than other employees because of the relevant characteristic." *Reichman v. City of New York*, 117 N.Y.S.3d 280, 285 (App. Div. 2d Dept. 2020).

Owens claims that Centene created a hostile work environment "by refusing to enforce its anti-harassment policy

against co-workers Ava Brewster, who sent her threatening text
messages and [] Zeigler Moore [sic], who stalked her on the
internet and disseminated photos of her children."  Pl.'s Mem.
in Opp. 1.[10]  Owens goes on to claim that Centene is "vicariously
liable for a hostile work environment created by a non-
supervisory employee when the employer knew of the employee's
conduct and acquiesced in such conduct and failed to take
immediate appropriate action."  *Id*. at 14; *see also* Pl.'s 56.1 ¶
119 ("Ziegler-Moore created a hostile work environment when she
embarked on a concerted effort to harm Ms. Owens' career at
Centene.").

        Her environment was hostile, Owens contends, in that
co-workers Brewster and Zeigler-Moore, among other things,
"engaged in intimidating behavior" and "access[ed] her facebook
page," and Centene refused to enforce the company's anti-
harassment policy against them.  Pl.'s Mem. in Opp. 14-15.
Owens does not really contend (and produces no evidence tending
to show) that Brewster or Ziegler-Moore were motivated, in whole
or in part, by discriminatory animus.  In contrast, Owens
herself asserts that Brewster was "angry because Ms. Owens had
admonished her about her failure to meet" a deadline, Pl.'s 56.1

---

[10] To the extent Plaintiff intends to raise the three investigations
themselves, as opposed to the ultimate termination of her employment, as an
additional basis for a hostile work environment claim, that arguments fails
for the same reasons stated in Part III.A., *supra*.

¶ 45, and that Ziegler-Moore was "angry with her for admonishing her about her poor work performance." *Id.* ¶ 122.

As to the company itself: even if we assume that Centene did not enforce its anti-harassment policy well enough, Owens does not connect that failure to her own protected status. As established above, Owens does not contend that Centene even *knew of* her relationship status with Johnson when Centene's H.R. investigated Brewster's alleged harassment. Indeed, she consistently suggests otherwise — namely, that Centene learned the truth of her relationship status in September (and terminated her then on that basis). Moreover, Owens does not allege that any other employee was treated differently based on relationship status, whether in the course of a harassment investigation or otherwise.

Moreover, the undisputed evidence shows that when Owens reported the allegedly threatening texts from Brewster, Centene initiated an immediate and thorough investigation. *See* Pl.'s 56.1 ¶¶ 42, 44; Defs.' 56.1 ¶¶ 42, 44. At the end of that investigation, Centene directed that Brewster (and Owens) be coached on communication in the workplace. Pl.'s 56.1 ¶¶ 64, 69; Defs.' 56.1 ¶¶ 64, 69. Just a month later, Owens received a bonus of over $21,000. Pl.'s 56.1 ¶ 75. Similarly, when Ziegler-Moore submitted her first anonymous complaint, Centene

investigated and concluded that the allegations of harassment were unfounded.  Defs.' 56.1 ¶¶ 86-89; Pl.'s 56.1 ¶¶ 86-89.

Thus, Centene is entitled to summary judgment on Owens' hostile work environment claim.[11]

### IV.  Conclusion

For the reasons stated above, Defendants are entitled to summary judgment as to all claims.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.


_/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:     September 30, 2022
           Brooklyn, New York

---

[11] Defendants also contend that Centene Corporation is not a proper party to this case because Centene Management Co. was her only employer. Defs.' Mem. in Supp. 23-24.  Because I conclude that the defendants are entitled to summary judgment on Owens' claims, I do not reach that question.